UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,

v.

CHRISTOPHER M. ROEDER,

Defendant.

Criminal No. 18-30003-MGM

MEMORANDUM & ORDER REGARDING
DEFENDANT'S SUPPLEMENTAL MOTION FOR JUDGMENT OF ACQUITTAL
(Dkt. Nos. 179)

June 19, 2019

MASTROIANNI, U.S.D.J.

Christopher Roeder ("Defendant"), a former police officer, was charged with violating an arrestee's Fourth Amendment rights (18 U.S.C. § 242) and falsifying a report about the incident (18 U.S.C. § 1519). A jury convicted Defendant of both counts. He subsequently moved for judgment of acquittal under Fed. R. Crim. P. 29(c). (Dkt. No. 157.) The court treated the motion as seeking additional time to file a Rule 29 motion so Defendant could have sufficient time to order and review the trial transcripts. (Dkt. No. 158.) After having that time, Defendant filed a supplemental Rule 29 motion, challenging the sufficiency of the evidence underlying both convictions.[1] (Dkt. No. 179.) The government opposed the motion (Dkt. No. 181), and it is now ripe for consideration. As explained below, Defendant's motion for judgment of acquittal will be denied.

---

[1] Defendant also filed a motion for a new trial (Dkt. No. 163), which remains pending.

# I. FACTS AND PLAUSIBLE INFERENCES IN THE LIGHT MOST FAVORABLE TO THE VERDICT

Defendant was formerly a police officer with the Hadley Police Department ("HPD"). On March 30, 2017, he was working a traffic detail in Hadley, Massachusetts where the town's Department of Public Works ("DPW") was trimming trees. Nickolas Peters drove a pickup truck down the street where the DPW was working and where Defendant was directing traffic. The side mirror of Mr. Peters' truck hit Defendant's elbow. According to Edward Koehler[2] (a DPW worker on the scene), Defendant yelled at Mr. Peters and grabbed the door of the truck—Mr. Koehler described Defendant as "hanging on [the] door" and "banging on the side of the guy's pickup"—but Mr. Peters accelerated and drove away. (Jan. 30, 2019 Trial Tr. (Dkt. No. 176) at 9:16-22, 33:3-5.) Mr. Koehler then heard Defendant say, "I'll get that fucker. He's a contractor, he'll be coming through town." (*Id.* at 10:8-10; *see also id.* at 31:5-12.) Mr. Koehler described Defendant as being "agitated" and "mad." (*Id.* at 10:20.) Mr. Koehler was taken aback by Defendant's behavior and had never seen anything like it. Almost immediately after Mr. Peters drove off, an officer from a different police department pulled up. Defendant told the officer he had just been hit by a pickup truck, she turned on her flashing lights and drove after Mr. Peters, but she did not find him. Defendant later called Mr. Koehler's home phone and asked him to come to the police department to give a statement; Mr. Koehler never did.

On April 3, 2017, Defendant was handling traffic enforcement and saw a pickup truck that resembled the one that had hit him a few days earlier. As the pickup drove past Defendant, he recognized its driver as the person who had hit him and had driven off. Defendant then activated his emergency lights, followed the pickup, and pulled it over. Defendant told Mr. Peters he was going to

---

[2] The parties spell his last name as "Koehler" (*see* Dkt. Nos. 104-1, 179, 181), but it is spelled "Keeler" in the trial transcript (*see* Dkt. No. 176), which matches how Mr. Koehler pronounced his name while on the stand. He was not asked to spell his name for the record. The court spells his name as the parties do.

2

arrest him for what had happened on March 30, and Defendant called HPD for backup. Defendant eventually transported Mr. Peters to the police station for booking. The dispatcher on duty, Richard Downie, testified that when Defendant arrived at the station, "[h]e seemed a little anxious, irritated" and "had an angry look on his face." (Jan. 29, 2019 Trial Tr. (Dkt. No. 168) at 101:5-10; *see also id.* at 123:15-16, 123:25-124:6.)³

Defendant and HPD Officer Courtney Call booked Mr. Peters. Two video cameras captured what happened during the booking process. Three videos were admitted into evidence at trial: the footage from the two cameras and a split screen video showing the footage from both cameras next to each other. (Trial Exs. 1 (video from side of booking area), 4 (split-screen video), & 12 (video of view from behind booking desk).) Only the side-view camera recorded audio; that audio plays in both the side-view and split-view videos. This still from the split-view shows the perspective of each camera, with the side-view on the left and the view from behind the booking desk on the right:



Officer Call photographed Mr. Peters while he was standing against a wall of the booking area. He then sat on the bench in the booking area, and she walked out of view of the side camera and asked him a question. He stood up while answering and quickly sat back down. As he was sitting

---

³ On cross-examination, Officer Downie testified that Defendant's fast-paced movements, which Officer Downie interpreted as meaning Defendant was agitated, also were consistent with how Defendant normally acts. (Jan. 29, 2019 Trial Tr. (Dkt. No. 168) at 125:22-126:1.) On redirect, Officer Downie explained he had known Defendant for "a couple of years," and Defendant "seemed more anxious than normal." (*Id.* at 127:17-20.)

3

down, Defendant spoke to Mr. Peters, but it is difficult to decipher what Defendant said. Mr. Peters responded, "Sir, I was asked a question, okay" and then Mr. Peters twice said, "Settle down."

Defendant and Officer Call were behind the booking desk during this interaction. Defendant came around the booking desk toward where Mr. Peters sat. While approaching him, Defendant said, "You're not in charge here, bud." Mr. Peters replied, "I know I'm not." Mr. Peters was seated with his hands in his lap; he gestured a few times while speaking with Defendant:

 

Defendant held handcuffs in his right hand and, with his left hand, reached for Mr. Peters' right arm and hand:



As Defendant reached, Mr. Peters said, "I'm not being cuffed" and put both hands behind his back, so they were between his body and the wall behind him. Defendant's left arm ended up between Mr. Peters' right arm and Mr. Peters' body so that Defendant's hand was behind Mr. Peters' back. The handcuffs remained in Defendant's right hand:

 

Defendant told Mr. Peters, "You are being cuffed. You are being cuffed. Release your grasp right now." The next second, Defendant used his right elbow to strike Mr. Peters in the nose:



After striking Mr. Peters, Defendant cuffed Mr. Peters' left arm to the bar on the wall and left the immediate area. Officer Call tended to Mr. Peters, whose blood was dripping from his face

onto the bench and floor. Defendant, who had walked around to the other side of the booking desk, said, "I just told you, you're not in – I told you stop resisting." He asked for a colleague to call EMTs and continued booking Mr. Peters. After the EMTs arrived, Defendant told them Mr. Peters "just has a broken nose." Mr. Peters was taken to the hospital, diagnosed with a broken nose, and subsequently underwent surgery to repair it.

A few hours after the incident, Defendant, Officer Call, the dispatcher (Officer Downie), and Sergeant Ken Hartwright (the supervisor on duty) watched the video footage of it. Sergeant Hartwright instructed Defendant to document the incident. Accordingly, that night, Defendant wrote a police report about it. HPD Officer Janelle Seitz testified she saw Defendant typing the report at a computer in the squad room. He showed her the booking video, which was open in a minimized window on the computer.

The Government charged Defendant with intentionally making four false statements in his police report:

1. Defendant knowingly falsely wrote that Mr. Peters made an obscene comment toward Defendant after Mr. Peters had been instructed to turn his head to complete the booking photograph process.

2. Defendant knowingly falsely wrote that Mr. Peters sat down slowly after Defendant instructed him to sit down and that Mr. Peters attempted to stand again when Defendant tried to handcuff him.

3. Defendant knowingly falsely wrote that he used his right hand to attempt to gain control of Mr. Peters' left arm while ordering him to stop resisting.

4. Defendant knowingly falsely wrote that he had no alternative options to delivering an elbow strike directly to the bridge of Mr. Peters' nose in order to gain his compliance.

The jury found the Government proved its case only as to the first and third statements. (Verdict Form (Dkt. No. 154).)

At trial, the government called witnesses who testified about training Defendant received regarding the use of force. Sergeant Brian Daly (who was both a fact and expert witness) testified

6

that the type and amount of force an officer may use depends on his perception of a subject's actions. The police academy uses training modules to teach recruits about using force. The modules classify a subject's behavior and provide appropriate responses depending on the behavior. Sergeant Daly was the defensive tactics instructor who taught Defendant at the police academy, and Sergeant Daly used these modules when training Defendant.

A subject who is "resistant active" is "using some sort of physical or mechanical energy enhancement toward their resistant effort." (Jan. 30, 2019 Trial Tr. (Dkt. No. 176) at 62:21-63:1.) For example, if a subject was participating in a sit-in or die-in form of protest and the officer placed his hands on the subject, the subject would become "resistant active" if he "pulled [his] arm away or tightened [his] body up" or "activat[ed] the muscles or us[ed] a mechanism to resist, such as latching on to an object that is stationary to prevent [his body] from being moved."[4] (*Id.* at 63:2-13.) In response to active resistance, an officer may use "compliance techniques" that use "minimal pain compliance, short-term, to get somebody to stop resisting." (*Id.* at 66:25-67:6.) Examples include "a front wrist lock, a rear wrist lock, an arm bar takedown, . . . [pepper] spray, . . . a baton controlling technique." (*Id.* at 67:7-10; 77:1-5 ("[For an active resistant subject,] [w]e're allowed to use a counter-joint manipulation to use momentary pain distraction. So even though they're not assaulting us, we can, in fact, inflict a small amount of pain on them to get them to stop resisting us."); *see also id.* at 85:12-92:7 (describing compliance techniques).) A compliance technique is an "on/off switch" that causes short-term pain. (*Id.* at 68:1-4.) Sergeant Daly explained the police academy does not teach

---

[4] Defendant's use-of-force expert agreed with the following definition of "active resistance": "any physical act which is contrary to an officer's commands or efforts to control or arrest an individual. Examples of active resistance are pulling arms or hands away, holding arms under one's body, twisting the body, tensing the arms or hands, moving hands in a manner contrary to the commands of the officer." (Feb. 1, 2019 Trial Tr. (Dkt. No. 170) at 226:10-18.)

7

elbow strikes as a type of compliance technique because they carry a "[s]ignificant risk of injury." (*Id.* at 92:13-21.)

The next level of a subject's behavior is classified as "assaultive bodily harm," which describes someone who "displays signs that an attack is going to be imminent, clenched fists, bladed stance[,] . . . words that are coming out of their mouth, things like, 'I'm not going to jail. If you touch me, I'm going to kill you, or I'm going to strike you, or I'm going to hit you,' things like that." (*Id.* at 63:14-22.) In response to "assaultive bodily harm," an officer may use "defensive tactics" like "empty hand strikes, punches, knee strikes, elbow strikes, edge-fist strikes, baton strikes, things like that." (*Id.* at 67:11-22; *see also id.* at 92:22-95:5 (describing defensive tactics).) An elbow strike carries a risk of injury because "[i]t's a larger area" of the officer's body, "there's more bone showing," and an officer "tend[s] to generate more force, because you're closer to your zero line or center mass." (*Id.* at 95:3-5.) Sergeant Daly compared "resistant active" to "assaultive bodily harm": "Active resistance is preventing the officer from moving or from getting an arm or things like that; where an assaultive bodily harm subject, there's more of a focused attack on the person." (*Id.* at 64:1-4.)

Sergeant Daly also testified about target areas of a subject's body where police recruits are trained to focus depending on the threat level. The bridge of the nose may be an appropriate target area when "there [i]s a significant attack. We would teach strikes to that area usually during an edge-weapon defense," which is when an officer is "being attacked by someone with an edge weapon, a knife, a razor blade, things like that." (Jan. 30, 2019 Trial Tr. (Dkt. No. 176) at 116:23-117:7.)

On an exam at the police academy covering these topics, Defendant scored a 96, meaning he got only two questions wrong. He got the following questions correct:

17. Q: "An officer is attempting to place a subject under arrest. When the officer attempts to control the subject's arm, the subject tries to pull his/her arm away from the officer. Based on the MPTC Use of Force Model this subject would be classified as a/an _____. (A) Cooperative Subject; (B) Active Resistant Subject; (C) Assaultive (Bodily Harm / Deadly Force) Subject; (D) Assaultive (Serious Bodily Harm / Deadly Force) Subject; (E) None of the Above."

8

  A: "(B) Active Resistant Subject."

18. Q: "Based on the Officer's perception of the Subject's actions in Question 17, what would be the 'balanced' force option for this officer? (A) Baton Strike; (B) Front Punch; (C) Elbow Strike; (D) Rear Wrist Lock; (E) None of the Above."

  A: "(D) Rear Wrist Lock."

50. Q: "As a general rule and whenever lethal force is unnecessary, avoid a Subject's _____ and _____ entirely. (A) Forearm and Upper Arm; (B) Thigh and Shin; (C) Buttocks and Calf; (D) Head and Neck; (E) None of the Above."

  A: "(D) Head and Neck."

(Trial Ex. 6.)

Defendant himself and both parties' experts testified an officer may not use force out of anger or to punish someone. (Jan. 31, 2019 Trial Tr. (Dkt. No. 169) at 16:25-17:3, 27:1-10 (Sergeant Daly's testimony); Feb. 1, 2019 Trial Tr. (Dkt. No. 170) at 91:16-18 (Defendant's testimony); *id.* at 187:13-15, 223:11-17 (Defendant's expert's testimony)).

Beyond using force, Sergeant Daly testified that officers are trained that they can "disengage and reassess." (Jan. 30, 2019 Trial Tr. (Dkt. No. 176) at 147:24-25; *see also id.* at 186:8, 187:3-4.)

The government also called Lieutenant Brian Pomeroy, who trained Defendant, to testify about the training he provides recruits about how to write police reports. In particular, he testified he trains recruits that "[r]eports need to be complete and they need to be accurate and they need to be truthful." (Jan. 31, 2019 Trial Tr. (Dkt. No. 169) at 176:23-24.) Specifically with respect to reports regarding the use of force, recruits are trained that

> it's even more important that [those reports are] complete; that they put all the information in that needs to be in there; that they're truthful because these types of reports are going to be scrutinized even more so. We tell them—in fact, we strongly advise police departments that they should have the use of force module readily available to their officers so that they can refer to it and use terminology that they were taught and put it right in their reports.

(*Id.* at 177:7-16.)

## II.     STANDARD

In deciding this motion, the court must "view the evidence, both direct and circumstantial—and including all plausible inferences drawn therefrom—in the light most favorable to the verdict." *United States v. Rivera Calderón*, 578 F.3d 78, 88 (1st Cir. 2009). "[T]he government need not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction." *United States v. Loder*, 23 F.3d 586, 590 (1st Cir. 1994). Rather, the question is whether the evidence and inferences "would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." *United States v. Cruz-Rodríguez*, 541 F.3d 19, 26 (1st Cir. 2008). The court does "not weigh the evidence or make any credibility judgments, as those are left to the jury." *United States v. Merlino*, 592 F.3d 22, 29 (1st Cir. 2010); *see also United States v. Pérez-Ruiz*, 353 F.3d 1, 7 (1st Cir. 2003) ("Credibility issues must be resolved in favor of the verdict."). "The court must reject only 'those evidentiary interpretations . . . that are unreasonable, insupportable, or overly speculative, and must uphold any verdict that is supported by a plausible rendition of the record.'" *United States v. Ofray-Campos*, 534 F.3d 1, 31-32 (1st Cir. 2008) (quoting *United States v. Hernández*, 218 F.3d 58, 64 (1st Cir. 2000)).

## III.     DISCUSSION

### A.     Deprivation of a Constitutional Right (18 U.S.C. § 242)

The civil rights charge under 18 U.S.C. § 242 required the government to prove beyond a reasonable doubt: (1) Defendant acted under color of law; (2) he subjected Mr. Peters to the use of unreasonable force, which violated his Fourth Amendment right to be free from unreasonable seizures; (3) Defendant acted willfully; and (4) Mr. Peters was present in the United States. Defendant's motion focuses on elements two and three, apparently conceding elements one and four.

The evidence was sufficient for the jury to find Defendant guilty of this charge. The video footage—which was played repeatedly throughout the trial—showed Defendant's and Officer Call's interactions with Mr. Peters leading up to the elbow strike. Mr. Peters answered questions during booking, cooperated while being photographed, and remained seated when Defendant approached him after telling him he was not in charge. Mr. Peters said he would not be handcuffed and put both hands behind his back as Defendant reached for him. Based on both Sergeant Daly's and Defendant's expert's testimony, the jury could have found that Mr. Peters' conduct was "resistant active," which could have justified the use of a compliance technique in response. And the jury could have found, consistent with the testimony from both parties' experts, an elbow strike to the nose was not a reasonable response to "resistant active" conduct.

The jury also heard testimony from HPD Detective Sergeant Jesse Green, who interacted with Mr. Peters when he was being arrested on April 3, 2017 and who watched the video footage. Detective Sergeant Green explained (1) Mr. Peters acted similarly on the video as he had when he interacted with Detective Sergeant Green,[5] (2) Mr. Peters' non-compliance was "not uncommon," and (3) Detective Sergeant Green did not think about striking Mr. Peters to control him. (Jan. 31, 2019 Trial Tr. (Dkt. No. 169) at 220:7-10, 221:1-4, 221:11-13.)

---

[5] Detective Sergeant Green responded to Defendant's radio call when he pulled Mr. Peters over on April 3rd. According to Detective Sergeant Green, Mr. Peters resisted several times: "We were talking with the operator of the vehicle and the operator was hesitant on getting out of the car and was, he was kind of resistant to Officer Roeder's commands on getting out of the car and walking back to the truck." (Jan. 31, 2019 Trial Tr. (Dkt. No. 169) at 212:14-17); "[Peters] didn't know what was going on. He kept asking over and over again why he was being arrested, and he didn't want to – his hands were in front of his body and he didn't want to pull his hands behind his back to be arrested." (*id.* at 213:10-14); "[Peters] was keeping his arms stiff by his side. He wouldn't pull his hands behind his back like we had asked him." (*Id.* at 213:17-19); "[Peters] still wasn't pulling his hands behind his back so we had to forcibly pull each arm around to his back and then handcuff him." (*id.* at 214:14-16); Q: "[D]uring the course of trying to handcuff and arrest Mr. Peters, did he have to receive multiple commands to do what he was being asked to do?" A: "Yeah. He was told several times to put his hands behind his back." Q: "And . . . he refused those commands until you actually physically moved his arms behind his back?" A: "Correct." (*id.* at 214:23-215:6).

11

In addition, the government presented evidence supporting its theory Defendant was angry with Mr. Peters and struck him as punishment: Mr. Koehler testified Defendant said, after Mr. Peters hit Defendant's elbow with his truck, "I'll get that fucker. He's a contractor, he'll be coming through town"; the dispatcher, Officer Downie, testified he has known Defendant for years, and Defendant was "anxious," "irritated," and "angry" when he arrived at the station with Mr. Peters; and the jury could infer from Defendant's statement after he struck Mr. Peters—"I just told you, you're not in – I told you stop resisting"—that he struck Mr. Peters to show him he was not in charge, *i.e.*, as a form of punishment. As Defendant himself and the parties' experts explained, officers are not permitted to use force to punish someone or out of anger.

As to willfulness, evidence of whether an officer complied with his training relates to whether he acted willfully. As the Seventh Circuit has explained:

> We have before recognized that evidence of departmental policies can be relevant to show intent in § 242 cases. Other circuit courts have as well. Those decisions, expressly or impliedly, acknowledge that an officer's training can help inform his state of mind in certain circumstances. If, for example, an officer has been trained that officers should do certain things when confronted with tense situations, and he does those things, the fact that he acted in accordance with his training could make it less likely that he acted willfully. And vice versa: If, as here, an officer has been trained that officers should not do several things when confronted with tense situations, yet he does those things anyway, the fact that he broke from his training could make it more likely that he acted willfully.

*See United States v. Proano*, 912 F.3d 431, 439 (7th Cir. 2019) (internal citations omitted). (*See also* Rulings Regarding Objections to Expert Disclosures (Dkt. No. 92) at 4-5 (analyzing relevance of officer's training to issue of willfulness)). The government presented evidence of the training Defendant received about when to use force and the types of force to use. In particular, Defendant correctly answered three exam questions directly related to using force against an active resistant subject, using an elbow strike, and avoiding a subject's head unless lethal force is necessary. On the stand, Defendant acknowledged he had not been taught to use a strike to the head as a distractionary

12

technique.⁶ (Feb. 1, 2019 Trial Tr. (Dkt. No. 170) at 70:18-21.) Sergeant Daly also explained that an elbow strike to the face is not taught as a distractionary technique. (Jan. 30, 2019 Trial Tr. (Dkt. No. 176) at 92:12-17.) This evidence was sufficient for the jury to find Defendant willfully deprived Mr. Peters of his right to be free from the use of unreasonable force, which violated his Fourth Amendment right to be free from unreasonable seizures.

### B.     Falsification of a Document (18 U.S.C. § 1519)

The falsification charge under 18 U.S.C. § 1519 required the government to prove beyond a reasonable doubt: (1) Defendant knowingly falsified or made a false entry in a record or document; (2) Defendant, acting in relation to or in contemplation of an investigation of a matter, intended to impede, obstruct, or influence the investigation or proper administration of that matter; and (3) the matter was within the jurisdiction of the FBI, an agency of the United States. The jury found two statements in Defendant's police report were false: first, that Mr. Peters had made an obscene comment and, second, that Defendant tried to use his right hand to control Mr. Peters' left arm. Defendant contends there was insufficient evidence to support a conviction for either statement. His argument rests primarily on the contention that the government's witnesses were incredible and could not remember certain details from the video of the incident. He also argues both statements are unrelated to his use of force, and, therefore, he did not intend to impede, obstruct, or interfere with the FBI's investigation into his use of force.⁷

---

⁶ Sergeant Daly testified the same purpose underlies both compliance and distractionary techniques: they "distract [a] person long enough to stop their resistance and get them into custody." (Jan. 30, 2019 Trial Tr. (Dkt. No. 176) at 85:15-23.)

⁷ Defendant also argues the statements were not material to the FBI's investigation, but materiality is not an element of 18 U.S.C. § 1519. (Motion for Judgment of Acquittal (Dkt. No. 179) at 18.)

First, the court cannot "weigh the evidence or make any credibility judgments, as those are left to the jury." *Merlino*, 592 F.3d at 29. Thus, to the extent Defendant's argument is based on the credibility of the government's witnesses, it is unpersuasive.

Defendant's second argument—that the statements are unrelated to his use of force, so he could not have intended to impede, obstruct, or interfere with the FBI's investigation—is creative but also unpersuasive. Both statements *are* related to Defendant's use of force. Defendant's motion correctly notes an obscenity does not justify using force. He argues that because responding to an obscenity with force is impermissible, the inclusion of the false allegation regarding Mr. Peters' use of an obscenity cannot be related to Defendant's use of force. But Defendant's inclusion of that allegation does not strip it of having any relation to the FBI's investigation. Indeed, the FBI investigated whether the circumstances justified the force Defendant used, so statements in Defendant's report that might explain why he used force are relevant to his use of force. Similarly, the false statement regarding which arm Defendant used to control which of Mr. Peters' arms is relevant to the circumstances leading up to the elbow strike.[8] Those circumstances are relevant to whether Defendant's use of force was reasonable, which was the subject of the FBI's investigation. Moreover, which hand Defendant used to try to control one of Mr. Peters' hands was easily verifiable in the video, which Defendant was watching when he wrote his report. In sum, the evidence supported the jury's findings that Defendant made two false statements in his report in violation of 18 U.S.C. § 1519.

---

[8] Defendant contends this statement is not false because "the booking video shows that [he] ultimately was able to handcuff Mr. Peter's [sic] left arm to the booking room bar using the cuffs he had been holding in his right hand." (Motion for Judgment of Acquittal (Dkt. No. 179) at 18.) It is true that *after* Defendant struck Mr. Peters, Defendant cuffed his left arm to the bar on the wall. But the statement in Defendant's report about which arms did what relate to what happened *before* Defendant struck Mr. Peters: "I stepped in front of him and with my right hand attempted to gain control of his left arm, while ordering him to stop resisting. Mr. Peters continued to resist and was not compliant with my commands. . . . Based on my positioning relative to Mr. Peters and my available options, I decided to utilize an elbow strike to the bridge of Mr. Peters' nose." (Trial Ex. 11.)

## IV. CONCLUSION

For the foregoing reasons, Defendant's supplemental motion for judgment of acquittal (Dkt. No. 179) is DENIED.

It is So Ordered.

/s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge